*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 10a0180p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

GARY T. WINNETT, FREDA
JACKSON-CHITTUM, CASPER R. HARRIS,
WILLIAM H. DAILEY, CALVIN E. GROGAN,
KENNETH C. HAMMER, CHARLES A.
WATERFIELD and MICHAEL J. FINN, on behalf
of themselves and others similarly situated,
                    *Plaintiffs-Appellees,*

            *v.*

CATERPILLAR, INC.,
                    *Defendant-Appellant.*

No. 08-6236

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 06-00235—Aleta Arthur Trauger, District Judge.

Argued:  October 15, 2009

Decided and Filed:  June 22, 2010

Before:  MARTIN, ROGERS and SUTTON, Circuit Judges.

_____

### COUNSEL

**ARGUED:**   Joseph J. Torres, WINSTON & STRAWN LLP, Chicago, Illinois, for Appellant.  Michael M. Mulder, MEITES, MULDER, MOLLICA & GLINK, Chicago, Illinois, for Appellees.  **ON BRIEF:**  Joseph J. Torres, C. R. Gangemi, Jr., WINSTON & STRAWN LLP, Chicago, Illinois, Steffen N. Johnson, WINSTON & STRAWN LLP, Washington, D.C., for Appellant.   Michael M. Mulder, Paul W. Mollica, MEITES, MULDER, MOLLICA & GLINK, Chicago, Illinois, Elizabeth Alexander, LIEFF, CABRASER, HEIMANN & BERNSTRIN, Nashville, Tennessee, William T. Payne, John Stember, Pamina Ewing, STEMBER, FEINSTEIN, DOYLE & PAYNE, LLP, Pittsburgh, Pennsylvania, Jay E. Sushelsky, AARP FOUNDATION LITIGATION, Washington, D.C., for Appellees.

The court delivered a PER CURIAM opinion.  MARTIN, J. (p. 16), delivered a separate concurring opinion.

_____

**OPINION**

_____

PER CURIAM.  At stake in this interlocutory appeal are the claims of one subclass of plaintiffs in an ongoing class-action lawsuit against Caterpillar for allegedly breaching its promise to provide "lifetime cost-free retiree health care."  R.61, ¶ 2.  The district court preliminarily enjoined Caterpillar to provide the subclass—275 plaintiffs who retired from a Caterpillar subsidiary between 1992 and 1998—with this benefit.  Because the statute of limitations bars the claims of this subclass, we reverse.

I.

In 1987, Caterpillar formed a subsidiary, Caterpillar Logistics Services (CLS), to market its warehousing and product distribution services to third parties.  Caterpillar's warehousing and distribution services are located in UAW-represented facilities, and, when CLS was formed, CLS employees were subject to the 1988 collective bargaining agreement (the 1988 CBA) between UAW and Caterpillar.  Among other benefits, the 1988 CBA purported to provide lifetime, cost-free healthcare to retirees and their surviving spouses.  To bolster the marketability of CLS's services, Caterpillar and the UAW agreed that CLS's services to third parties would not be interrupted during any UAW strikes at Caterpillar facilities.  Caterpillar and the UAW also agreed that, in the event of a strike, the 1988 CBA would govern CLS employees during negotiation of a new CBA, and that any new CBA would apply to CLS employees.  The possibility of applying a new CBA to CLS retirees—those who retired between 1992 and the ratification of a new UAW-Caterpillar CBA—was not discussed.

The 1988 CBA expired in 1991, and in 1991, during negotiations over a new CBA, the UAW instituted several strikes.  One aspect of the UAW-Caterpillar dispute turned on Caterpillar's proposal to cap retiree medical benefits in return for increased pension benefits.  Consistent with their agreement, CLS employees did not participate in the strikes, and they continued to receive benefits under the 1988 CBA.  On March 16, 1998, a new CBA between UAW and Caterpillar (the 1998 CBA) was ratified.  Between January 1, 1992 and

the ratification of the 1998 CBA on March 16, 1998, a few hundred CLS employees retired, known here as the CLS retirees or subclass.

In March 1998, Caterpillar gave the CLS subclass notice of benefits changes brought about by the new CBA, including increases in the basic pension benefit rate, an additional early retirement allowance, and lump-sum payments to retirees, as well as an increase in prescription drug co-pays and a limit on adding new dependents. The 1998 CBA also established a managed care network, under which Caterpillar would reimburse 100% of expenses for medical services by a preferred provider in the managed care network but only 70% of such expenses for services by a non-network provider. While the 1988 CBA purported to provide free lifetime healthcare benefits for retirees, the 1998 CBA "limited" "[c]ompany contributions" for medical benefits "as of the year 2000 for those employees retired after January 1, 1992." A-1600.

On April 20, 1998, Caterpillar told the UAW that CLS employees who retired during the 1992–98 labor dispute would "prospectively be eligible for the same pension and benefit provisions as other employees who retired under the terms and conditions [in the 1998 CBA]." R.246-10. By May 1, 1998, the CLS subclass thus received the 1998 CBA's increased basic pension rates, plus additional early retirement allowance and lump-sum pension payments, and was subject to the 1998 CBA's cap on retiree healthcare costs. And by June 1, 1998, the subclass was subject to the 1998 CBA's managed care network.

In November 1999, Caterpillar mailed the members of the CLS subclass a Summary Plan Description (SPD) that outlined the benefits changes in the 1998 CBA. The SPD noted the increases in basic pension rates, additional early retirement allowance, and lump-sum pension payments, as well as the increase in prescription drug co-pays, the limit on adding new dependents, and the imposition of a managed care network. As to the cap on retiree healthcare benefits, the SPD said:

> Company contributions for health care benefits for employees who retired on or after January 1, 1992 are capped at the average annual cost per individual in 1997 projected to 1999. Thereafter, the Company will continue to pay up to that amount each year for retiree health care benefits. If costs rise above that amount, beginning January 1, 2000, retirees will be required [to] contribute towards the cost of health care benefits in the form of a monthly premium.

> *Note: The VEBA (Voluntary Employee Benefit Association) Trust Fund assets will be used to cover retiree premiums after the year 2000 until trust assets are depleted.  Once that fund is depleted, monthly premium contributions from retirees will be required.*  A-1658–59.

In 2004, when the VEBA fund was nearly depleted, Caterpillar began deducting a monthly healthcare premium from the pensions of CLS subclass members.  In June 2006, Caterpillar began charging the CLS subclass deductibles, out-of-pocket charges and co-insurance charges up to certain maximums.

On March 28, 2006, the CLS subclass and other Caterpillar retirees filed this lawsuit against Caterpillar under § 301 of the Labor-Management Relations Act,  29 U.S.C. § 185, and § 502 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1132.  As amended, the complaint  alleges that Caterpillar breached the 1988 CBA's commitment to provide free, unalterable, lifetime healthcare benefits for retirees when it (1) charged retirees and their surviving spouses a premium for healthcare benefits, (2) "increased charges for drug prescription co-pays, deductibles, and other out-of-pocket expenses," and (3) made "reductions in retiree healthcare." R.61, ¶ 29–30, ¶ 59.  Caterpillar moved to dismiss the lawsuit, contending that the six-year statute of limitations barred it because the plaintiffs' claims accrued in 1998 when Caterpillar applied the new CBA to them.  The district court denied the motion because

> the wording of Caterpillar's communications regarding retiree benefits . . . was so indefinite and contingent on future events, it could hardly have been clear to the plaintiffs that, years before the defendant actually began to make the challenged deductions, the plaintiffs had suffered an injury and that the statute of limitations on their claims had begun to run.

*Winnett v. Caterpillar, Inc.*, 496 F. Supp. 2d 904, 927–28 (M.D. Tenn. 2007).

The CLS subclass moved for a preliminary injunction to prevent Caterpillar from charging CLS retirees and their surviving spouses premiums, deductibles, and other medical care payments.  Caterpillar opposed the motion, reiterating its argument that the claims were time-barred and contending that Caterpillar never made a promise of lifetime, unalterable, free healthcare benefits to the CLS employees.  In 2008, the court granted the preliminary injunction.  579 F. Supp. 2d 1008.  The court held that the CLS subclass had shown a likelihood of success on the merits because the evidence indicated that they had a vested

right to lifetime cost-free medical care.  *Id.* at 1034. The court held that the CLS subclass would suffer irreparable harm without injunctive relief because class members testified that they had delayed medical treatment due to the costs of obtaining it.  *Id.* at 1035–36. The court held that an injunction would not substantially harm Caterpillar due to the company's financial stability.  *Id.* at 1037.  And the court held that an injunction would advance the public interest.  *Id.* at 1038.

The court also held that new evidence introduced in connection with the preliminary injunction motion "did not change, and, in fact bolster[ed]" its earlier decision that the CLS subclass's claims were not time-barred.  *Id.* at 1040.  In the court's words:

> From 1992 until late 2004, retirees had every reason to believe that future negotiations between the UAW and Caterpillar would prevent Caterpillar from implementing the caps [on retiree healthcare costs]. From the very beginning, Caterpillar described the caps as a possibility dependent and contingent on future events. This indefinite and uncertain language continued until October 10, 2004, when Caterpillar began deducting retiree health care premium charges from the CLS retirees' pensions.

*Id.* Caterpillar's imposition of the managed-care network and other changes from the 1998 CBA, the court reasoned, together with the CLS subclass's acceptance of these changes, did not trigger the accrual of the claims because the changes were "minor" and did not put the CLS subclass on notice that Caterpillar was repudiating a vested right to lifetime cost-free health care.  *Id.* at 1041.  "Essentially," the court explained, "'no cost' retiree health care to which the plaintiffs were entitled under the 1988 agreement was still available if the retiree stayed in Network" until 2006, when Caterpillar began charging the CLS subclass deductibles, out-of-pocket charges, and co-insurance charges up to certain maximums.  *Id.* Caterpillar appeals, challenging the district court's decision to grant injunctive relief and its decision that the claims were timely filed.

## II.

Courts weigh four factors in deciding whether to issue a preliminary injunction: "(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public

interest would be served by granting injunctive relief." *Entm't Prods., Inc. v. Shelby County, Tenn.*, 588 F.3d 372, 377 (6th Cir. 2009). But most of this is largely beside the point here. "[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed," *Mich. State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997), and time-barred claims necessarily have no chance of success.

Congress did not provide a statute of limitations for claims under § 502 of ERISA and § 301 of LMRA, requiring courts to borrow the time limit from the forum state's most analogous cause of action. *See Sterling China Co. v. Glass, Molders, Pottery, Plastic, & Allied Workers, Local No. 24*, 357 F.3d 546, 552 (6th Cir. 2004) (LMRA); *Meade v. Pension Appeals and Review Comm.*, 966 F.2d 190, 194–95 (6th Cir. 1992) (ERISA). Tennessee's six-year limit on breach-of-contract actions, the parties agree, governs this claim. *See* Tenn. Code Ann. § 28-3-109.

Although state law sets the length of the statute of limitations, "federal law" establishes when the "statute of limitations begins to run." *Mich. United Food & Comm. Workers Union & Drug Employees v. Muir Co.*, 992 F.2d 594, 598 (6th Cir. 1993). Under federal law, as under most laws, the limitations clock starts ticking "when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation." *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994) (LMRA); *see Mich. United Food & Comm. Workers Union & Drug Employees*, 992 F.2d at 598 (ERISA). In the context of this contractual claim—the refusal to honor a promise of free, unalterable, lifetime healthcare benefits—the parties agree the clock starts when the breach becomes "clear and unequivocal." *Morrison v. Marsh & McLennan Co.*, 439 F.3d 295, 302 (6th Cir. 2006).

The CLS retirees filed this lawsuit on March 28, 2006. That means that, if they discovered or reasonably should have discovered Caterpillar no longer was willing to provide free, unalterable, lifetime healthcare benefits under the 1988 CBA at least six years earlier, namely before March 28, 2000, the claim must be dismissed as time-barred. *See Noble*, 32 F.3d at 1000 ("[T]he asserted actual knowledge of plaintiffs is not determinative if they did not act as reasonable persons and, in effect, closed their eyes to evident and objective facts concerning the accrual of their right to sue.").

A.

The retirees filed the claim too late because it accrued at least by 1998, when the UAW and Caterpillar reached a new labor agreement that altered the healthcare benefits available to retirees and for the first time announced new costs for obtaining them, and Caterpillar applied the new agreement to the CLS retirees. First, the contractual theory of the subclass is that Caterpillar was obligated to provide the healthcare benefits associated with the 1988 CBA to retirees for life. If there is one thing that became clear in 1998, it was that the 1988 CBA no longer governed their healthcare benefits. Starting on May 1, 1998, with the implementation of the new CBA, Caterpillar placed the subclass on equal footing with non-CLS retirees who also retired between 1992 and 1998, by applying the healthcare benefits associated with the 1998 CBA to *all* of them, namely to *all* Caterpillar retirees who retired after the end of the 1988 CBA in late 1991.

Second, not only did Caterpillar no longer apply the 1988 CBA to the retirees in 1998, but that year it also no longer honored the alleged promise of free, lifetime, unalterable healthcare benefits associated with the 1988 CBA. In connection with the 1998 CBA, Caterpillar immediately altered the benefits package and increased the costs of it by (1) increasing prescription drug co-pays, (2) placing a limit on new dependents that could be added to a plan, (3) establishing a managed care network, which reimbursed 100% of expenses for medical services by a preferred provider in the managed care network and 70% of such expenses for services by a non-network provider, and (4) adding new limits to vision and dental care.

In 1998, Caterpillar announced two other significant changes: (1) it capped the amount it would contribute to each retiree's healthcare plan, and (2) it added a broader reservation-of-rights clause, giving the company an unfettered right "to terminate the plan," A-1679. *Cf.* A-405 (making the right to terminate benefits *under the 1988 plan* "[s]ubject to applicable collective bargaining agreements"). As to the capping of premium contributions, a notice dated March 1998 and distributed to the subclass explained that the "Company contributions are limited as of the year 2000 for those employees retired after January 1, 1992." A-1600. The SPD distributed in November 1999 added that "Company contributions for health care benefits for employees who retired on or after January 1, 1992

are capped at the average annual cost per individual in 1997 projected to 1999," A-1658, and informed the subclass that, "[i]f costs rise above that amount, beginning January 1, 2000, retirees will be required [to] contribute towards the cost of health care benefits in the form of a monthly premium." A-1658.

All of these notices of the various 1998 changes—especially the notice provided by the SPD, which plan sponsors must distribute to advise participants of their benefits, 29 U.S.C. § 1022(a)—provided the "clear repudiation" necessary for the subclass's claims to accrue. *See Hirt v. Equitable Retirement Plan for Employees, Managers and Agents*, 285 F. App'x 802, 803 (2d Cir. 2008) ("distribution of . . . SPD constituted a clear repudiation" of plaintiffs' benefits and triggered the statute of limitations); *cf. Bergt v. Retirement Plan for Pilots Employed by Markair*, 293 F.3d 1139, 1143 (9th Cir. 2002) ("SPD is the statutorily established means of informing participants of the terms of the plan and its benefits and the employees primary source of information regarding employment benefits."). While the 1988 CBA allegedly had provided free, unalterable, lifetime healthcare benefits for retirees, the notices explained that this would no longer be true given the application of the 1998 CBA to the CLS retirees, who now faced managed care, increased prescription co-pays, a limit on the number of dependents eligible to be in a plan, new limits on vision and dental care, and a "limit[]" on "[c]ompany contributions" for medical benefits "for those employees retired after January 1, 1992."

Nor did the notices leave any doubt about the effects of these changes on the costs of the retirees' healthcare plan. As of March 1998, the subclass knew that the VEBA, not Caterpillar, would "cover the difference in monthly premiums after the year 2000" and would only do so "until trust assets are depleted." A-1600. The 1999 SPD explained that, while the VEBA could delay retiree-paid premiums, it could not prevent them. "Once [the VEBA] is depleted," the 1999 SPD confirmed, "monthly premium contributions from retirees *will be required*." A-1659 (emphasis added). Caterpillar's repudiation of the 1988 plan's "no-cost" guarantee was clear and unequivocal.

Third, the accrual of a cause of action turns on when subclass members *knew of* Caterpillar's change in benefits, not when they *felt* its effects. *See Morrison*, 439 F.3d at 301 (claim accrues when claimant receives notice that benefits were denied); *see also Carey v.*

*Int'l Bhd of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44, 47–48 (2d Cir. 1999) (cause of action accrues upon "clear repudiation," not when application for benefits is denied); *Union Pac. R.R. v. Beckham*, 138 F.3d 325, 330–31 (8th Cir. 1998) (same); *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65–67 (7th Cir. 1996) (same). As these cases show, a would-be litigant cannot postpone the accrual of a cause of action by claiming that, even though the company gave notice of a change in benefits in year one, the change did not affect the litigant's health or pocketbook until year four. If a company announces the removal of, say, a dental-care benefit, the claim accrues on the date of the company's announcement and notice, not the first day the affected individual needs dental work. Were it otherwise, the limitations period would start at a different point for every employee or retiree, even though they all work (or worked) for the same company and even though they all face the same change in benefits. All of this means that the CLS retirees' claim for breach of contract accrued in 1998 when Caterpillar announced the changes, not when the retirees first felt the changes, whether in 2004 when the announced cap on the company's contributions to retirees' healthcare premiums first had an impact on the retirees' pocketbooks or at some other date when the initiation of managed care, dependent limitations or increased co-pays for prescription drugs first affected the healthcare choices of individual retirees or the costs borne by them.

Fourth, while notice is the touchstone of accrual, this case is easier than most in one respect: It involves claims that *affected* the plaintiffs soon after they were announced—if not in 1998, then certainly before March 28, 2000. In addition to challenging Caterpillar's authority to cap its contribution to retirees' healthcare premiums, the complaint challenged other changes that affected the subclass immediately: "increased charges for drug prescription co-pays, deductibles, and other out-of-pocket expenses." R.61, ¶¶ 29–30, 59. That the retirees' own complaint challenges Caterpillar's authority to make these kinds of alterations, whether first made in 1998 or repeated in different forms in 2004, proves that they were material. And that the subclass offers no explanation how these changes would not have affected them soon after they were announced confirms that the claim accrued in 1998.

Nor are we aware of any authority for the concept that *a cause of action* under, say, § 301 of the LMRA could have *different accrual dates* for each affected healthcare benefit.

If true, that would require the courts to identify a different accrual date for each benefit—one for increased co-pays for prescription drugs, one for managed care, one for caps on company contributions to the healthcare premiums and so on—even when the company announces all of the changes to the benefits at the same time in connection with the negotiation of the same 1998 CBA and even when the claimants challenge all of them in the same complaint.

The testimony of subclass members, moreover, confirms that they knew of the changes to their benefits prior to 2000, whether because the changes already had affected their healthcare choices or knew they soon would. Al Church, a former CLS employee, testified that he knew, pre-2000, to seek treatment for his heart attack from a network hospital because "there would be more [to] pay if [he] had treatment outside [the network]." R.298, 257. William Dailey, another CLS retiree, testified that as of 1998 he "always tried to be in the network" to avoid increased medical costs. R.298, 275. And though subclass member Gary Winnett testified that the first time he felt personally affected by the changes in his plan was 2004, he also explained that he understood in 1998 that "VEBA would only continue to pay [his] premiums so long as there was money in there to do so." R.299, 515. Because by 1998 all signs confirmed the reality that Caterpillar would no longer administer benefits to the subclass under the 1988 contract, the subclass's complaint—filed almost eight years later—came too late.

Fifth, an analogy to union grievances completes the picture. Had the union represented the subclass in 1998 and 1999, it would have had to grieve these changes then in order to preserve a right to challenge them later. If a company announces new authority to terminate or modify healthcare benefits, the union, we have held, must grieve the change at that point or be precluded from later claiming that benefits had vested. *Maurer v. Joy Technologies*, 212 F.3d 907, 919 (6th Cir. 2000); *see McCoy v. Meridian Automotive Sys. Inc.*, 390 F.3d 417, 424–25 (6th Cir. 2004). A similar conclusion applies here. The time for action—the time when the claim accrues—is when the company announces the changes, not some later date when certain changes affect certain employees. And that is particularly so here, where the company notified the retirees of many changes—not just of an unfettered right to terminate healthcare benefits, as with the reservation-of-rights clause in *Maurer*, but also of new co-pays, managed care, caps on company contributions to premiums, and changes to dental and vision benefits. It would be strange to say that the time to grieve a

company's changes to healthcare benefits differs from the time when a cause of action accrues to challenge those same changes.

B.

The CLS retirees offer several arguments to the contrary. They claim that the 1998 and 1999 notices were too "indefinite and uncertain" for the retirees to know of the alleged breach until 2004, when the VEBA ran out and when Caterpillar began deducting monthly premiums from their pensions. Winnett Br. 40. Some of the notices, they point out, say only that they "may" be required to pay premiums "if" costs rise above the contribution caps. Winnett Br. 42, 45. But the 1999 SPD left no doubt about the legal stakes of the changes, notifying the retirees that monthly premiums "will be required" upon the VEBA's depletion. A-1659. Words like "may"' and "if"' did not purport to describe the legal effect of the 1998 changes if the VEBA ran out, but other possibilities—that the union or company could choose to make further contributions to the VEBA, that a future CBA would undo this aspect of the 1998 CBA, that modifications to Medicare would fill the gap, or even, most hopeful of all, that healthcare costs would remain stagnant or decline, thereby allowing the company to continue to pay *all* of the retirees' premiums. *Any* announcement about capping a company's contribution to healthcare premiums, however, could implicate these possibilities. What mattered was that, as of 1998 and 1999, the 1998 CBA, the company notices and the statutorily required SPDs left no doubt about the effect of the change on the company's legal obligations—that, once the VEBA was depleted, the retirees would be required to pay the difference in the cost of healthcare premiums between the company's now-capped contribution and the full cost.

Other changes left even less doubt. In 1998, the retirees immediately experienced managed care, increases in drug costs, changed eligibility criteria and new restrictions on adding dependents, all of which confirmed that Caterpillar was no longer providing 1988 level benefits, the ones to which they claimed a vested right for life. To discount these changes as "sundry minor benefit changes" that do not "trigger the limitations period," Winnett Br. 48, is a difficult argument to maintain given that their own complaint challenges the validity of precisely these kinds of changes. *See* R.61, ¶¶ 29–30. By any objective measure, the changes the subclass faced in 1998 cannot fairly be characterized as minor.

The managed-care network on its own marked a significant change from the health care the retirees enjoyed under the 1988 contract: Retirees for the first time faced the burden of paying "at least 30% of [their] covered expenses" if they chose out-of-network care. A-1589. This "reduction in the effective choices of coverage available for all retirees" was a very real limitation on their benefit program, *Reese v. CNH Am. LLC*, 574 F.3d 315, 325 (6th Cir. 2009), one that should have put the subclass on notice that Caterpillar had altered their benefits. And once we add raised co-pays, limits on dental and vision care and new eligibility criteria to the mix, not to mention Caterpillar's unfettered right to cancel benefits at any time, it is difficult to shrug off the 1998 changes as irrelevant to the accrual equation. *See Diehl v. Twin Disc, Inc.*, 102 F.3d 301, 305–06 (7th Cir. 1996) (challenging modifications to benefits such as replacement of the retirees' insurance carrier); *Zielinski v. Pabst Brewing Co.*, 463 F.3d 615, 617 (7th Cir. 2006) (challenging reductions to prescription-drug coverage); *Harps v. TRW Automotive U.S., LLC*, 351 F. App'x 52, 54–55 (6th Cir. 2009) (challenging restructuring of benefits so that Medicare-eligible retirees purchase Medicare D instead of receiving prescription drug benefits from the company).

Our recent decision in *Reese* is not to the contrary. First and foremost, it confirms that the introduction of managed care is not a "minor benefit change." That, indeed, is a key proposition that *Reese* rejects. *Reese*, 574 F.3d at 325. *Reese* proceeds to reach questions we do not: Did the company promise lifetime healthcare benefits? Did they vest? And, if all of that is true, did those promises prevent the company from instituting managed care? In holding that the changes to the retirees' medical benefits under *that* contract, including the company's institution of a managed-care network, did not impinge on their vested lifetime health benefits, *id.* at 324–25, *Reese* did not purport to say that any challenge to that change would not have accrued when the company announced it. To say that changes in a healthcare package did not violate a promise of lifetime benefits in one case does not establish when a cause of action challenging that kind of change accrues in another. To put the point another way: Just because we conclude in this case that a cause of action challenging the 1998 changes to the healthcare package for retirees, including the introduction of managed care, accrued in 1998 does not mean that those changes necessarily violated the 1988 CBA. It means only that any challenge had to be brought within six years of 1998.

The subclass protests that, had they filed their case before 2000, it would have been dismissed as unripe.  But a ripeness problem arises only if the claim involves "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agricultural Prods. Co.*, 473 U.S. 568, 580–81 (1985).  In 1998 and 1999, there was nothing contingent about Caterpillar's decision not to apply the 1988 CBA to the subclass.  What purported to be unalterable had been altered—some of it affecting the subclass immediately and all of it showing that healthcare benefits for the subclass were (1) no longer unalterable (because they imposed a managed-care network, raised co-pays, charged deductibles on out-of-network care, increased eligibility criteria and limited dental and vision coverage), (2) no longer free (because premiums would be charged as soon as the VEBA ran out) and (3) no longer necessarily for life (because Caterpillar announced an unfettered right "to terminate the plan," A-1679).  Because the accrual of a cause of action in this area turns on *notice* of the legal changes to a plan, not the later effects of those changes, the retirees could have challenged the changes in 1998.  *See also* 29 U.S.C. § 1132 (plaintiff may bring a civil action "to clarify his rights to future benefits under the terms of the plan"); *cf. Cat Tech LLC v. TubeMaster, Inc.*, 528 F.3d 871, 883–84 (Fed. Cir. 2008) (party may seek declaratory judgment to obtain "relief from uncertainty and delay regarding" "legal rights").

The subclass separately complains that Caterpillar staked out inconsistent litigation positions in this case.  "On  the one hand," the subclass claims, "Caterpillar argues that [the subclass's] claims are not timely . . . .  On the other hand, Caterpillar asserts that surviving spouses' claims are not ripe because Caterpillar has not yet begun to charge them premiums."  Winnett Br. 41.  This mischaracterizes the company's argument.  In 2006, Caterpillar retracted a decision to collect premiums from surviving spouses, who then received medical care without paying premiums.  That decision, Caterpillar noted, *mooted* the surviving spouses' claims in this case, but it did not make them unripe.  *See Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (while mootness means that a claim comes "too late," ripeness means that a claim comes "too early").  There is nothing inconsistent about arguing that the surviving-spouses' claim no longer presents a live controversy (given Caterpillar's decision not to charge them premiums) and arguing that the entire suit is time barred (given its accrual eight years ago before the complaint was filed).

The subclass separately argues that we should treat Caterpillar's 1998 and 1999 notices as an "anticipatory breach" and that the retirees did not have an obligation to sue until the contract was actually breached, which occurred when the company began collecting premiums. Were that the case, however, this common-law contracts doctrine would eliminate the discovery rule for accrual, which requires claimants to sue upon receiving *notice* of the breach. Even if anticipatory-breach principles could apply in a discovery-rule case, they would not help the subclass: Caterpillar did not just announce its intent to apply a different CBA—the 1998 CBA, not the 1988 CBA—prior to 2000; it implemented immediate, fundamental changes to the retirees' medical benefits before then.

\* \* \* \* \*

Enforcing a statute of limitations is never easy. The inquiry puts the validity of the claimants' underlying cause of action to the side. And it thus requires us to dismiss all claims, whether valid ones or not, if they were untimely filed. All of this can be particularly difficult in the context of a claim for healthcare benefits by retirees, a group that often is without ready access to new sources of income to cover new costs.

Statutes of limitations, however, promote fairness concerns of their own. No one should be forced to defend stale claims, and courts often are ill-equipped to resolve disputes long after the key events took place. In this case, the limitations period—six years—was longer than most. And there was no mystery about the stakes of the debate between Caterpillar and the UAW from the end of the 1988 CBA in 1991 to the consummation of the 1998 CBA. Throughout the negotiation, a central point of disagreement was Caterpillar's proposal to cap the company's contribution to healthcare premiums. Under the 1998 CBA, the company limited employees' and retirees' healthcare benefits but did so in return for increases in their pension rates, an additional early retirement allowance and lump-sum and supplemental pension payments. After the announcement of the 1998 CBA, the company confirmed that the CLS retirees would be eligible for, and thus reap the benefit of, the increased pension benefits, and the company's notices confirmed that the retirees would face new limitations on their healthcare benefits.

Placed in this light, the retirees' decision not to file this lawsuit in 1998 is perhaps understandable. The company was not compelled to increase the pension benefits of pre-

existing retirees, and a lawsuit about the changes to their healthcare benefits might have dissuaded the company from extending the pension benefits to the retirees.  The near-term changes to their healthcare benefits also may have seemed tolerable in light of the immediate pension increase, and, given the existence of the VEBA, it was not known exactly when they would have to contribute to their healthcare insurance premiums.  The key point, however, is that the company's notices put the stakes clearly on the table in 1998 and 1999, properly forcing the retirees either to accept the bitter with the sweet and forgo litigation or to challenge the changes to the 1988 benefits package within six years of the 1998 CBA.

III.

For these reasons, we reverse the preliminary injunction and remand the case to the district court for further proceedings.

———————————————

**CONCURRENCE**

———————————————

BOYCE F. MARTIN, JR., Circuit Judge, concurring. As the lead opinion notes, it is never easy to enforce a statute of limitations. It is an especially bitter pill to swallow in this case because the Caterpillar Logistics Services retirees clearly have the better part on the breach of contract claim. The 1988 Collective Bargaining Agreement unequivocally obligates Caterpillar to provide no-cost, unalterable healthcare to the retirees for life, and that benefit vested under the 1988 Agreement when these plaintiffs retired. Caterpillar's various assertions to the contrary are simply untenable. Thus, these retirees would have prevailed on their claim had it been timely filed.

But, the lead opinion's point about taking the bitter with the sweet is a fair one. Had the retirees sued earlier, Caterpillar might well have said, "Fine, you want the 1988 Agreement, you got it. Here's your no-cost healthcare, but we'll take back those increased pension payments and retirement allowances we gave you under the 1998 Agreement." I assume that, if given the choice, the retirees would have chosen to keep their no-cost healthcare and to forgo the increased pension benefits, but I may be wrong. Either way, I just hope that the decision to bring suit in 2006 rather than in 1999 or 2000 was an informed, strategic gamble to have the short and then sue later for the long sweetening, or even merely the result of oversight or inattention to the big picture. It would be heartbreaking to find out that hardworking folks lost an important benefit due to misguided legal advice.