RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

WILLARD BENDER; DON LAMPE; CAROLYN
CONNER; JAMES TAYLOR; ROGER SMOKER;
ROSE ANN ROHR, individually and on behalf
of themselves and all persons similarly
situated,

          *Plaintiffs-Appellees,*

INTERNATIONAL UNION UNITED AUTOMOBILE
AEROSPACE AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA (UAW),

          *Plaintiff,*

    *v.*

NEWELL WINDOW FURNISHINGS, INC.,
KIRSCH DIVISION; NEWELL OPERATING
COMPANY, INC.; and the NEWELL
RUBBERMAID HEALTH AND WELFARE
PROGRAM 560,

          *Defendants-Appellants*.

No. 11-1335

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:06-CV-113—Robert J. Jonker, District Judge.

Argued: April 10, 2012

Decided and Filed: May 3, 2012

Before: GUY, COLE, and ROGERS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Jack F. Fuchs, THOMPSON HINE LLP, Cincinnati, Ohio, for Appellants.
Michael L. Fayette, PINSKY, SMITH, FAYETTE & KENNEDY, LLP, Grand Rapids,
Michigan, for Appellees. **ON BRIEF:** Jack F. Fuchs, Stephen L. Richey, THOMPSON
HINE LLP, Cincinnati, Ohio, for Appellants. Michael L. Fayette, PINSKY, SMITH,
FAYETTE & KENNEDY, LLP, Grand Rapids, Michigan, for Appellees.

---

**OPINION**

---

RALPH B. GUY, JR., Circuit Judge.  This appeal concerns the contractual right to continued healthcare benefits for members of a certified class of retirees, their spouses, surviving spouses, and eligible dependents under § 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1132(a)(1)(B), and § 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185. Defendants Newell Operating Company, Inc. (Newell), its subsidiary Newell Window Furnishings, Inc., Kirsch Division (Newell Window), and the Newell Rubbermaid Health and Welfare Program 560 (Newell Plan), appeal from the judgment entered in favor of plaintiffs, which included monetary damages for the individual plaintiffs and declaratory and injunctive relief requiring that defendants provide vested lifetime healthcare benefits to the class members depending on the relevant date of retirement.

Appealing the order granting summary judgment to plaintiffs, defendants challenge the district court's determinations:  (1) that Newell Window is bound as a successor liable under earlier collective bargaining agreements (CBAs) to which it was not a party; (2) that members of the plaintiff class had vested rights to company-paid health insurance and/or Medicare Part B premium reimbursements; and (3) that the plaintiffs' claims were not barred by the applicable six-year statute of limitations.  For the reasons that follow, the district court's judgment is affirmed.[1]

**I.**

The retirees were all bargaining-unit employees of a plant located in Sturgis, Michigan, that manufactured window furnishings such as drapery hardware and window

---

[1]Defendants also argue, without much development, that the certification of a single class of plaintiffs should be vacated for a lack of commonality and because the district court has retained jurisdiction over the matter. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005).  Nor is there a basis for us to review the district court's decision to retain jurisdiction.

blinds.  The bargaining-unit employees were represented by former UAW Local 797 (Union), although their employer changed several times during the relevant period.  The Sturgis plant was owned by and was the headquarters for Kirsch Company, a Michigan corporation, until it was acquired as a division of Cooper Industries, Inc., in 1981.  In 1997, Cooper Industries transferred the Kirsch assets to a newly formed subsidiary named Kirsch, Inc., and then sold that subsidiary to the Newell Company.  Newell changed the name back to Kirsch Company, and, in 1998, merged Kirsch with another Newell subsidiary to form what is now Newell Window.  Newell Window closed the Sturgis plant pursuant to a Shutdown Agreement negotiated with the Union in 2000.  This litigation arose out of Newell's announcement in November 2005 that it would consolidate all retiree healthcare plans for administration by CIGNA Healthcare, and that a premium of $40 per month would be charged to all retirees across the board effective January 1, 2006.

This case was not the first to be filed.  Rather, anticipating litigation and seeking to control the forum, Newell, Newell Window, and the Newell Plan quickly filed suit in federal court in the Northern District of Illinois against the Union and nearly 500 retirees seeking declaration that the changes were lawful.  One month later, the Union and four retiree plaintiffs filed this action, individually and on behalf of a purported class, in the Western District of Michigan alleging that the benefit changes violated ERISA and breached the CBAs in violation of the LMRA.  The Illinois suit was ultimately dismissed on jurisdictional grounds in favor of this action, and that decision was affirmed by the Seventh Circuit.  *See Newell Operating Co. v. UAW*, 532 F.3d 583 (7th Cir. 2008) (*overruled on other grounds by Envision Healthcare, Inc. v. PreferredOne Ins. Co.*, 604 F.3d 983 (7th Cir. 2010)).  The forum dispute is not before us, but, as will be discussed later, the district court considered allegations made in the Illinois case in deciding the question of successor liability.

Once the forum dispute was resolved, and after a tentative settlement fell apart, the retiree plaintiffs filed a third amended class action complaint that dropped the Union as a plaintiff, added two more retirees as named plaintiffs, and brought new claims for

full reimbursement of Medicare Part B premiums.[2]  The district court granted, in part, the plaintiffs' motion for class certification—declining to establish the three subclasses proposed by plaintiffs but certifying a single class of all former Newell Window, Kirsch Company, or Cooper Industries bargaining-unit employees at the Sturgis facility who retired on or before July 31, 1998, and their spouses, surviving spouses, and eligible dependents.  Although probably known to the parties, there are no representations on appeal as to the number or identity of the class members.

Defendants filed a flurry of motions for summary judgment in December 2009, including separate motions by Newell, the Newell Plan, and Newell Window.  Plaintiffs filed responses, as well as their own joint motion for summary judgment.  After review of the voluminous record and full briefing, the district court denied the defendants' motions and granted the plaintiffs' motion for summary judgment for the reasons articulated in its opinion and order entered July 6, 2010.  *See Bender v. Newell Window Furnishings, Inc.*, 725 F. Supp. 2d 642 (W.D. Mich. 2010).  Defendants' timely motion for reconsideration was denied, and judgment was finally entered in February 2011.

The corrected judgment awarded damages, plus interest, to the individual plaintiffs for medical insurance and/or Medicare Part B premiums, the amounts of which are not in dispute on appeal.[3]  With respect to the class claims, the district court declared that some of the class members were entitled to vested lifetime healthcare benefits "at the levels in place for their respective retirement groups (pre-1986 retirees and 1986 - 1993 retirees) prior to the changes imposed by Defendants beginning January 1, 2006."  Further, the district court declared that, with the exception of certain retirees age 62 to 65, the benefits must be provided at no cost to the class; decided that pre-1986 retirees

---

[2]There is no challenge to the district court's dismissal of the Union based on its waiver and release in the Shutdown Agreement.  Accordingly, except where noted, reference to "plaintiffs" is to the named retiree plaintiffs.

[3]Specifically, damages were awarded to Roger Smoker for only Medicare Part B reimbursements ($3,894.90); to Carolyn Connor for both medical insurance premiums and Medicare Part B reimbursements ($5,407.20); and to William Bender, James Taylor, Donald Lampe, and Rose Ann Rohr for only medical insurance premiums ($2,240.00 each).  These plaintiffs were representative of different levels of benefits within the certified class.

were entitled to coordination (rather than integration) of Medicare Part B benefits; and determined that all retirees and spouses (but not dependents) were entitled to vested lifetime reimbursement of Medicare Part B premiums from Newell to the full extent that the premiums exceeded a "capped" monthly contribution from the Pension Plan of $11.70. Defendants were also enjoined from amending the plans or providing benefits inconsistent with the judgment. Finally, while recognizing that there were no class claims for money damages, the district court retained jurisdiction to implement and enforce the judgment including "to conduct all appropriate proceedings to address the appropriate remedy for Class Members for past conduct by Defendants that has been inconsistent with the terms of this Judgment." Defendants' timely appeal followed. To date, the only further proceedings conducted in the district court were related to plaintiffs' pending motion for attorney fees and costs.

## II.

We review de novo the district court's grant of summary judgment, as well as decisions on questions of contract interpretation. *Noe v. PolyOne Corp.*, 520 F.3d 548, 551 (6th Cir. 2008); *Maurer v. Joy Techs., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000).

### A.      Successor Liability[4]

Defendants take issue with the determination that Newell Window is liable as a successor for whatever retiree healthcare benefits vested under the pre-1998 CBAs entered into between its predecessors and the Union. It is true that "a successor corporation generally is not liable for its predecessors liabilities unless expressly assumed." *Yolton v. El Paso Tenn. Pipeline Co.*, 435 F.3d 571, 586 (6th Cir. 2006) (citing *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 279, 286-88 (1972)). Here, the

---

[4]Defendants do not dispute that Newell Operating Company, as the sponsor of the healthcare benefit plan, and the Newell Plan, as the provider of the retiree healthcare benefits in dispute, were proper defendants in this action. The district court concluded as much based on their participation in the declaratory judgment action filed in Illinois. *See Bender*, 725 F. Supp. 2d at 655 ("If [Newell Operating and the Plan] were proper plaintiffs in Illinois, they are proper defendants here."). Nor do these defendants deny that "their presence is necessary to ensure complete and effective relief, as they themselves must have recognized when they fired the first shot as plaintiffs in Illinois." *Id.*

district court found an assumption of liability (although there seems to be no question that there was also a substantial continuation of operations at the plant by Newell Window and its predecessors). *See Wood v. Int'l Bhd. of Teamsters*, 807 F.2d 493, 498-99 (6th Cir. 1986).

Defendants argue that the district court improperly applied judicial estoppel based on statements made in the Illinois complaint alleging that Newell Window was a successor to Cooper and Kirsch Company with respect to healthcare benefits. *Bender*, 725 F. Supp. 2d at 654. That is, defendants argue, judicial estoppel applies only "to a party who has *successfully* and unequivocally asserted a position in a prior proceeding." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982) (emphasis added). However, while it is true that the Illinois complaint was dismissed, it is clear that the district court did not rely on judicial estoppel but properly recognized the Illinois complaint as containing a "party admission" that could be considered with the other evidence in the record. *See Barnes v. Owens-Corning Fiberglas Corp.*, 201 F.3d 815, 829 (6th Cir. 2000); *Dixie Sand & Gravel Corp. v. Holland*, 255 F.2d 304, 310 (6th Cir. 1958). The admission that Newell Window was a successor in interest was confirmed by other documentary evidence (including the transfer agreements and a partially disclosed "due diligence" memorandum), and the defendants' course of conduct. For example, a letter from June 1997 addressed to Kirsch retirees stated: "Because Newell has assumed Kirsch's ongoing commitments to its retirees for medical coverage, your benefits will not be changed."

Defendants also renew the argument that retiree healthcare benefit liabilities were "cut off" either because they were not transferred by Cooper to its subsidiary, or because of a reservation-of-rights provision in the transfer agreement between Cooper and Newell. These arguments are no more persuasive on appeal. First, defendants argue that the 1997 Amended and Restated Asset Transfer Agreement between Cooper Industries and Kirsch, Inc. (Cooper-Kirsch Agreement), transferred only liabilities for CBAs *in effect* at the time (or, in other words, only liability for unexpired CBAs). However, the provision relied upon, § 7.3, does not represent the retention of such liabilities by Cooper

and reflects Kirsch's express assumption of "all collective bargaining agreements and all Liabilities associated therewith, that are in effect between any Cooper Company and a union or other collective bargaining representative covering Employees or Former Employees."  Also, as the district court found, § 4.1.11 expressly provides for the assumption of liabilities associated with "Employee Benefit Plans in which Employees or Former Employees participate or have participated."  The definition of "Employee Benefit Plans" includes plans that provided "post-retirement or post-employment benefits." Further, § 8.6 acknowledged that "Certain Employees and Former Employees are covered by welfare benefit programs maintained by [Cooper]" and provided that "Kirsch shall become a participating employer in the Cooper Welfare Plans."  The district court did not err in rejecting this claim.

Alternatively, defendants rely on the reservation-of-rights clause in § 6.4(f) of the 1997 Purchase and Sale Agreement between Cooper and Newell (Cooper-Newell Agreement), under which Newell agreed to provide "Former employees," *i.e.*, retirees, with "medical and life insurance coverage identical to that provided to them . . . under the Cooper Welfare Benefit Plans."  Also found in § 6(f) is the following clause:

> Buyer shall retain the right to amend or terminate Buyer's Welfare Benefit Plans as they pertain to said Employees and Former Employees; *provided*, *however*, Buyer shall provide the Employees listed on Schedule 6.4(f) with up to five years coverage . . . for retiree medical benefits under Buyer's Welfare Benefit Plans on terms substantially similar to those available to Buyer's active employees.

Elsewhere, Newell expressly assumed Cooper's liabilities under prior CBAs in § 5.12, which defined Cooper's obligations as including "any obligation, commitment, liability or responsibility of Seller, its Affiliates or its or their Predecessors . . . existing as of Closing under . . . (iii) *any labor or collective bargaining agreements relating to the Kirsch Companies*" and provided that "Buyer expressly agrees that it shall assume Seller's Company Obligations to the extent related to the Kirsch Companies, effective on the Closing Date, and shall thereafter discharge the same in accordance with their

terms." (Emphasis added.)[5] Finally, the reservation of the right to amend or terminate the Newell Plan could not alter the retiree healthcare benefits to the extent that they had already vested. *Bender*, 725 F. Supp. 2d at 655 ("Indeed, no subsequent agreement between the companies or between the company and the Union could lawfully do so.") (citing *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 434-35 (6th Cir. 2010); *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 444 (6th Cir. 2007)).

The district court did not err in finding that Newell Window is the successor in interest to the pre-1998 CBAs. Whether and to what extent retiree health insurance and/or Medicare Part B premium reimbursements were vested is a separate question from whether Newell Window is a successor to the earlier obligations.

**B.     Vesting of Bargained-for Welfare Benefits - Legal Framework**

Retiree healthcare benefit plans are welfare benefit plans under ERISA, but, unlike pension plans, are not subject to mandatory vesting requirements. *Maurer*, 212 F.3d at 914. As a result, vesting of retiree welfare benefits is a matter of contractual agreement. *Id.* If the parties intend for welfare benefits to vest and the agreement to that effect is breached, there is an ERISA violation as well as an LMRA violation. *Id.* Vesting occurs upon retirement, not eligibility for retirement, *see Winnett v. Caterpillar, Inc. (Winnett I)*, 553 F.3d 1000, 1011 (6th Cir. 2009), while "an employer is free to terminate any *unvested* welfare benefits upon the expiration of the relevant CBA," *Noe*, 520 F.3d at 552 (emphasis added). Significantly, in this circuit, a court may find vested welfare benefits "under a CBA even if the intent to vest has not been explicitly set out in the agreement." *Maurer*, 212 F.3d at 915; *see also Noe*, 520 F.3d at 552.[6]

---

[5] Closer examination of the five-year coverage language reflects that it is a promise to provide the 25 listed employees on Schedule 6(f), who were described as "active employees," with up to five years of *future* medical benefits upon their retirement.

[6] However, "[w]hen the health plan was *not* collectively bargained, we require a clear statement before we will infer that an employer meant to promise health benefits for life." *Reese v. CNH Am., LLC*, 574 F.3d 315, 321 (6th Cir. 2009) (citing *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 400 (6th Cir. 1998)).

Although governed by substantive federal law, we apply traditional rules of contract interpretation "as long as their application is consistent with federal labor policies." *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983). Under *Yard-Man*, the seminal case governing whether parties to a CBA intended welfare benefits to vest,

> courts must first examine the CBA language for clear manifestations of an intent to vest. [*Yard-Man*, 716 F.2d at 1479]. Furthermore, each provision of the CBA is to be construed consistently with the entire CBA and "the relative positions and purposes of the parties." *Id.* The terms of the CBA should be interpreted so as to avoid illusory promises and superfluous provisions. *Id.* at 1480. Our decision in *Yard-Man* also explained that "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Id.* at 1482. With regard to the "*Yard-Man* inference," later decisions of this court have clarified that *Yard-Man* does not create a legal presumption that retiree benefits are interminable. *Yolton*, 435 F.3d at 579. Rather, *Yard-Man* is properly understood as creating an inference only if the context and other available evidence indicate an intent to vest. *Id.*

>       When an ambiguity exists in the provisions of the CBA, then resort to extrinsic evidence may be had to ascertain whether the parties intended for the benefits to vest. *[UAW] v. BVR Liquidating, Inc.*, 190 F.3d 768, 774 (6th Cir. 1999). If an examination of the available extrinsic evidence fails to conclusively resolve the issue and a question of intent remains, then summary judgment is improper. *[United Mine Workers] v. Apogee Coal Co.*, 330 F.3d 740, 744 (6th Cir. 2003).

*Noe*, 520 F.3d at 552. If the issue cannot be resolved by summary judgment, it is now settled that there would be no right to a jury trial of these claims. *Reese v. CNH Am., LLC*, 574 F.3d 315, 327-28 (6th Cir. 2009).

Although no legal presumption arises and plaintiffs continue to bear the burden of proving that vesting has occurred, this court will apply the *Yard-Man* inference "so long as we can find either explicit contractual language or extrinsic evidence indicating an intent to vest." *Reese*, 574 F.3d at 321 (citing *Yolton*, 435 F.3d at 580) (internal quotation marks omitted). While application of *Yard-Man* has led to differing results,

this court has described the inference as acting like a "thumb on the scales" or "nudge" in favor of vesting. *Id.*[7]

As the district court explained, although many CBAs were entered into during the period from 1971 to 1998, the plaintiff class can be divided into three subgroups who claim benefits based on an employee's retirement: (1) before 1986; (2) from 1986 through the end of 1993; and (3) after 1993 (or more precisely, on or after January 1, 1994, but on or before July 31, 1998). The first two groups were found to have vested (although somewhat different) rights to lifetime health insurance benefits, and all three groups were found to have vested rights to full reimbursement of Medicare Part B premiums for retirees and spouses (but not dependents). Although both health insurance and Medicare Part B reimbursements are contractually based welfare benefits, they are discussed separately because the provisions and arguments are distinct.

## C.     Vesting of Medical Insurance Benefits

*Pre-1986.* Five CBAs used the same language to establish medical insurance programs for employees, including "'group insurance benefits, paid by the Company and underwritten by Aetna Life Insurance Company.'" *Bender*, 725 F. Supp. 2d at 646 (citations omitted). Each CBA provided that "'[t]he benefits of the program are set forth in a booklet and policy, a copy of each to be available to every employee.'" *Id.* The CBAs also expressly extended "'[t]he same benefits [to retirees] as for the employees and their dependents'" and specifically stated that "'[t]he Company agree[d] to pay the cost of such insurance for the retiree and his dependents.'" *Id.* As defendants point out, the 1982 CBA negotiated by Cooper provided that retiree medical insurance would be the same as for employees and dependents "as of July 1, 1980." Also, spouses and eligible dependents of deceased retirees could remain under "Kirsch Group Medical

---

[7]Defendants ask this court to abandon adherence to *Yard-Man* in order to preserve the issue for *en banc* or Supreme Court review, but offer no basis for this panel to overrule *Yard-Man*. *See United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000) ("This panel may not overrule the decision of another panel; the earlier determination is binding authority unless a decision of the United States Supreme Court mandates modification or this Court sitting en banc overrules the prior decision.").

Coverage at Company expense" provided that spouses did not remarry or become eligible for insurance through another employer.[8]

*1986 to 1993.* Three CBAs between 1985 and 1993 provided retirees with the "same benefits as for the employees and their dependents as of January 1, 1986," namely "group insurance paid by the Company." This granted the same health insurance benefits as above, except that the CBAs required retirees aged 62 to 65 to pay $20 per month toward the cost of such insurance (as would spouses and dependents of deceased retirees who were eligible to remain under the Cooper Comprehensive Health Care Plan). Also, as above, the CBAs each referred to a "booklet and policy" as setting forth the benefits of the program.

However, the 1993 CBA also included a negotiated end to health insurance benefits for *future* retirees. Specifically, effective with retirements on or after January 1, 1994, the CBA provided for a maximum of five years of post-retirement medical coverage, no coverage for the retiree or spouse past the age of 65, and monthly contributions toward the cost of the plan in an amount to be set when the employee retired. In fact, as noted above, no claim for medical insurance benefits is made on behalf of class members in the third group (post-1993 retirements). This change is nonetheless relevant because these negotiated changes contrast with the simultaneous continuation of health insurance benefits for employees retiring *prior* to the change.

That is, the 1993 CBA expressly provided that "Employees retiring prior to January 1, 1994, (Deletion) will be covered under the Cooper Industries Comprehensive Retiree Medical Plan (1/93 GWI), but, will have the same cost effective health benefits as those being granted active employees *as of January 1, 1986.*" (Emphasis added.) Again, retirees aged 62 to 65 would pay $20 per month toward the cost of such insurance for the retiree and his dependents (as would spouses and dependents of deceased retirees

---

[8]Defendants state in passing that surviving spouses of deceased retirees were not provided with health insurance until the 1980 CBA. Plaintiffs' only response seems to be that the corrected judgment provided vested benefits at levels in place at the time of retirement, which suggests agreement on the surviving spouse question. There is no indication whether the class actually includes any member claiming health insurance as a surviving spouse or dependent of a pre-1980 retiree.

who were eligible to remain under the Cooper Comprehensive Health Care Plan). Further, the CBA provided that employees who retire before January 1, 1994, "will retain retirement medical coverage under the Cooper Comprehensive Retiree Medical Plan" and "will receive a lump sum wage payment of $300 upon retirement." The district court found, and the extrinsic evidence established, that the prospective reduction of post-retirement healthcare benefits offered an obvious incentive for employees to retire before January 1, 1994 (and resulted in a greater than usual number of retirements at the end of 1993). *Bender*, 725 F. Supp. 2d at 647.

*Intent and Durational Clauses.* The district court found that the provisions granting retiree health insurance benefits suggested that, once retired, those benefits would continue indefinitely and without cost; except for those who retired under the CBAs that expressly limited the duration or required specific contributions toward the cost. Defendants argued in the district court that there was no vesting because each of the CBAs provided that "[t]he insurance program as set forth in Exhibit A is agreed to for the *duration of this contract.*" (Emphasis added.)

However, "[a]bsent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Noe*, 520 F.3d at 554. Unlike the specific limitation on the duration of health insurance for those retiring on or after January 1, 1994, this language was general in nature and did not create ambiguity regarding the intention that medical insurance benefits continue for those who had already retired. *See Maurer*, 212 F.3d at 917-18. Rather, the district court concluded that plaintiffs had met their burden of demonstrating that the CBAs unambiguously gave bargaining-unit employees who retired prior to January 1, 1994, a vested right to health insurance benefits. In addition, as discussed below, the district court also found that even if ambiguous, the extrinsic evidence was overwhelmingly one-sided in favor of lifetime vesting of medical insurance benefits for those claiming benefits based on retirements prior to January 1, 1994 (pre-1986 and 1/1/86-12/31/93). We turn to the defendants' principal arguments.

### 1.        Incorporation by Reference

First, defendants contend that the CBAs do not reflect an intention to vest because reservation-of-rights language in three summary plan descriptions (SPDs) were incorporated into the CBAs such that it would stand on "equal footing" with the provisions from which vesting might be inferred.  The incorporation language defendants rely upon, which is the same in each CBA, stated that the "benefits of the program are set forth in a booklet and policy, a copy of each to be available to every employee."  The district court did not address defendants' argument, which is based on dicta from *Schreiber v. Philips Display Components Co.*, 580 F.3d 355, 365 n.12 (6th Cir. 2009).

In *Schreiber*, the district court found the durational language to have unambiguously precluded vesting.  Reversing, this court found there was ambiguity that should have led the district court to consider the SPDs regardless of whether the subsequently issued SPDs may be properly regarded as extrinsic evidence of the parties' original intent.  *Id.*  In dicta that followed, the court suggested that repeated references to the SPDs in the CBA at issue in *Schreiber*

> may be enough to incorporate by reference portions of the SPDs into the CBA.  Courts generally cite contract language that is more explicit in its action [of incorporation], though in some cases they have found mere references to SPDs and plan booklets "sufficient to incorporate by reference."  *Int'l Ass'n of Machinists and Aerospace Workers v. ISP Chems., Inc.*, 261 Fed. App'x 841, 847-48 (6th Cir. 2008) (unpublished disposition); *see also* 11 Williston on Contracts § 30.25(4th ed.) ("Interpretation of several connected writings").  *Compare Yolton*, 435 F.3d at 580 (looking to a durational clause in the CBA stating "the insurance plan 'will run concurrently with [the CBA] and is hereby made part of this Agreement.'" (quoting the CBA)), *and Int'l Union, UAW v. Aluminum Co of Am.*, 932 F. Supp. 997, 1001 (N.D. Ohio 1996) ("Separate booklets describing these benefits are incorporated herein and made a part of this Agreement."), *with Bailey v. AK Steel Corp.*, 2006 WL 2727732 at *1 (S.D. Ohio Sept. 22, 2006) (unpublished disposition) ("Each CBA incorporates by reference the health benefit plan . . ." ).

*Id.* Lastly, this court added that "the district court would have been on solid ground had it interpreted the SPDs alongside the CBA before reaching the ambiguity issue." *Id.*

Here, the CBAs refer to a "booklet and policy," but do not include any explicit language of incorporation. Nor does the dicta in *Schreiber* compel a finding of reversible error based on this reference. In fact, in another case upon which the defendants rely, the district court acknowledged the *Schreiber* decision but concluded that simply referring to an SPD that was to be distributed to qualifying employees was not sufficient to constitute incorporation by reference. *See Moore v. Menasha Corp.*, 724 F. Supp. 2d 795, 804 n.3 (W.D. Mich. 2010) (*appeal pending* No. 10-2171). Finally, defendants' reliance on *United Steelworkers of America v. Commonwealth Aluminum*, 162 F.3d 447, 449 (6th Cir. 1998), is misplaced. Although the question in that case had to do with the arbitrability of grievances related to the denial of group benefits, the CBA in that case expressly stated that the group insurance booklets "*are incorporated herein* and made a part of this Labor Agreement by such reference." *Id.* (emphasis added). No similar explicit incorporation language has been identified in this case. The district court did not err in rejecting the defendants' incorporation-by-reference argument. Nonetheless, both *Schreiber* and *Moore* indicate that when no incorporation is found, the SPDs may be considered as extrinsic evidence in evaluating the intent to vest retiree welfare benefits.

## 2.       Unilateral Modification

Defendants argue, in the alternative, that the district court erred in concluding that reservation-of-rights language found in the three SPDs themselves did not preclude the vesting of retiree health insurance benefits. *See Reese*, 574 F.3d at 323-24; *Prater*, 505 F.3d at 444-45; *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 424-25 (6th Cir. 2004). This line of cases recognizes an exception to the general rule—applicable to collective bargaining agreements—that "'an existing contract cannot be unilaterally modified.'" *Prater*, 505 F.3d at 443 ("Were it otherwise, the option of either party to

modify a contract unilaterally would defeat the essential purpose of reaching an agreement in the first place—to bind the parties prospectively.").

The exception arose out of the holding in *Maurer* that a widely distributed SPD, issued after the CBA had been signed, prevented retiree health benefits from vesting because the union had failed to contest the SPD's express reservation of the right to "curtail or eliminate coverage for any treatment, procedure, or service *regardless of whether [the employee is currently] receiving treatment*." *Maurer*, 212 F.3d at 913 (emphasis added). That is, once the unqualified unilateral right was asserted in the SPD, "'the Union was obligated to grieve or enter suit' if it disagreed with the employer's assertion of authority—even if that assumption of authority came after the effective date of the relevant collective bargaining agreement." *Prater*, 505 F.3d at 444 (quoting *Maurer*, 212 F.3d at 919).

However, as explained in *Prater*, to read *Maurer* broadly would "run headlong into the rule that a plan summary 'cannot vitiate contractually vested *or bargained-for-rights*.'" *Prater*, 505 F.3d at 444 (citation omitted). As a result, the *Maurer* exception for unilateral modification has been expressly limited to "'unqualified reservation-of-rights language,' that claims a 'unilateral right by the employer to terminate coverage without regard to existing or future collective bargaining agreements.'" *Id.* (citations omitted). Although this standard is necessarily case specific, *McCoy*, *Prater*, and *Reese* each found the reservation of rights were not sufficiently unqualified so as to fairly be expected to prompt an immediate protest by the union.[9]

The reasons given in those cases included: (1) that the SPD acknowledged that termination or modification would be subject to the provisions of any applicable CBA (*McCoy* and *Prater*), or that any conflict would be governed by the official plan documents or labor agreements (*Reese*); (2) that, unlike in *Maurer*, the reservation of

_____

[9]Although plaintiffs overstate the Supreme Court's holding in *Cigna* as overruling *Maurer*, the decision does warrant caution concerning the force to be given language found in the SPDs themselves. *See Cigna Corp. v. Amara*, 131 S. Ct. 1866 (2011). In *Cigna*, an ERISA action to recover amounts due under an ERISA plan, the Court clarified that the provisions of an SPD could not be enforced as terms of the ERISA plan itself.

rights did not assert an explicit right to terminate coverage for even current treatment (*Prater*); and (3), "[p]erhaps most importantly," the CBA expressly provided that it could not be amended without mutual signed consent of the parties (*Prater*). Elaborating on the last of these, we explained that the prohibition on unilateral modification in the CBA meant that the union could not be required to protest the SPD as long as "the summary does not explicitly renounce the [CBA]." *Prater*, 505 F.3d at 445.[10]

*Aetna Summary.* Defendants rely specifically on a provision from the first "booklet," a 1978 Aetna Group Plan (Aetna Summary) covering various group insurance benefits, including medical insurance, which stated among its "general provisions":

> **Change or Discontinuance of Plan**—It is hoped that this Plan will be continued indefinitely, but, as is customary in group plans, the right of change or discontinuance at any time must be reserved.

Also, after specifying the benefits for the various group plans, a separate "summary" stated: "Your contributions toward the cost of the contributory coverages provided by this Plan will be deducted from your pay and they are subject to change." Despite defendants' comparison to *Maurer*, the Aetna reservation of rights did not specifically claim a unilateral right to terminate coverage without regard for existing or future CBAs.

*Cooper SPDs.* Defendants also rely on a Cooper Industries Health Care Plan–Retired Employees marked with "10/89-STD" on the back (1989 Cooper SPD) and a Cooper Industries Comprehensive Retiree Medical Plan marked "1/93 GWI" (1993 Cooper SPD). Defendants contend, in particular, that the 1989 Cooper SPD mandates reversal of the judgment with respect to all post-1985 retirees (*i.e.*, the 1986 to 1993 group). Under the heading "background information," the 1989 Cooper SPD states:

> **Amendment or Termination of the Plan:** Although the Company expects to continue the Plan in its present form, the Company may amend the Plan from time to time, or it may terminate the Plan altogether at

---

[10]*But see Prater*, 505 F.3d at 444 ("To our knowledge, no court of appeals has forced unions to file grievances in the face of a summary plan description that purported to remove a promise of lifetime health benefits.").

some point.  Amendments to the Plan could result in changes in the
benefit eligibility rules under the Plan, and in the benefit provisions
under the Plan.  A termination of the Plan could mean that all benefit
payments immediately cease, or that benefit payments would be
discontinued at some future date.  An amendment or termination of the
Plan could affect your eligibility for benefits under the Plan.  The
Company will notify you if it changes or terminates the Plan.

The exact same language was used in the 1993 Cooper SPD.

The district court found that this reservation was not sufficiently unqualified
because the SPDs otherwise reaffirmed that the CBAs would control any conflict.
*Bender*, 725 F. Supp. 2d at 659 (relying on *Prater* and *Reese*).  Specifically, both Cooper
SPDs included the same introductory provisions explaining, in part, that:  "This booklet
is a 'plain language' summary of your retiree health care benefits. . . . The highlights of
the plan in easy to understand language appear in this space at the beginning of each
section."  This introduction concluded with the following explanation:

> At the top of each section is a brief explanation of the information
> in that section.  This is followed by a general explanation of important
> information you should know about the plan.  *Sometimes, when plain
> language is used to explain the provisions of what is essentially a legal
> document, disagreements arise between the meaning given in the
> explanation and the wording of the legal document.  We do not expect
> that to happen, but if it should, the wording in the legal document will
> apply*.

(Emphasis added.)  Attempting to distinguish *Prater* and *Reese*, defendants argue that
the deference given to "a legal document" in this provision must mean deference to the
"formal plan" rather than to the CBA.  It is true that the SPDs in *Prater* and *Reese*
specifically acknowledged that the CBAs would control.  But, the record in this case
does not appear to contain any "formal plan" associated with the Cooper SPDs, and the
CBAs provided health insurance benefits "as set forth in a booklet and policy."  The
district court did not err in finding that the Cooper SPDs did not include an unqualified

assertion of a unilateral right to end retiree medical insurance benefits without regard for existing or future CBAs.[11]

However, even when the *Maurer* exception does not apply, the summaries nonetheless "serve as extrinsic evidence regarding the extent of the employer's promise of future healthcare benefits and whether the parties intended the benefits to vest." *Prater*, 505 F.3d at 445.

### 3.     Extrinsic Evidence

The district court found that the parties unambiguously intended that retiree health insurance benefits would vest for bargaining-unit retirees (and their eligible spouses and dependents) who retired prior to January 1, 1994, but that, even if the CBAs were deemed to be ambiguous, "the entire record of extrinsic evidence demonstrates, without a single contradictory voice, that the parties intended to vest lifetime retiree healthcare benefits." *Bender*, 725 F. Supp. 2d at 661. We agree.

The district court's statement of facts outlined the extensive extrinsic evidence with respect to both medical insurance benefits, *id*. at 649-51, and Medicare Part B reimbursements, *id*. at 651-52. Later, the district court succinctly summarized the extrinsic evidence regarding vesting of medical insurance benefits as follows:

> Individuals from both sides of the bargaining table, including members of company management and Union representatives, testified at deposition and stated in affidavits that the company and the employees intended to provide retirees with fully paid, vested, lifetime medical benefits. Mr. Keasey, a participant in most of the negotiations and a drafter of the collective bargaining agreements; Ms. McCurry, the administrator of health insurance and pension benefits at the Sturgis plant; Mr. Lampe, another main participant in the collective bargaining agreement negotiations; and Mr. Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, all stated that the Union and the company intended to vest lifetime group health

---

[11]Having reached this conclusion, we do not address plaintiffs' alternative arguments (1) that the Cooper SPDs were not actually distributed to employees; (2) the 1989 Cooper SPD may not have been the "booklet" referred to in the CBAs between 1985 to 1993; and (3) that the 1993 Cooper SPD did not apply to bargaining-unit employees who retired prior to January 1, 1994.

insurance for the retirees. The letters Cooper Industries sent to employees of the Sturgis plant on their retirement, the company's economic offers from various negotiations, and the retirement applications also demonstrate this intent. Even Defendants' own due diligence at the time of purchase shows that the agreements vested lifetime benefits. Its attorneys' "summary of the retiree medical and life insurance benefits" states that union employees who retired before January 1, 1994, are entitled to "[l]ifetime retiree coverage" of medical benefits.

*Id.* at 661. Defendants protest the district court's characterization of the due diligence memo prepared in connection with Newell's purchase of Kirsch from Cooper as being directly adverse to their position. As the district court explained, only two pages of that memo have been disclosed because they were provided to Great West Life in connection with the transfer of insurance coverage from Aetna. However, defendants' argument—that this memo described the benefits as "lifetime benefits" but never said they were "vested, inalterable or immutable"—is not persuasive and does not undermine its value as extrinsic evidence that the parties had intended retiree health insurance benefits to vest. Nor does the reservation-of-rights language in the 1997 letter sent to Kirsch retirees, or in the SPDs discussed above, overcome the heavily one-sided evidence that the parties intended health insurance benefits would vest for those who retired prior to January 1, 1994.

**D.      Vesting of Medicare Part B Premium Reimbursement**

Retirees were required to enroll in Medicare Part B and, until 1980, retirees were reimbursed for the entire cost of the Medicare Part B premium from the Pension Plan. Indeed, the CBAs prior to 1980 called for amendment of the Pension Plan to pay a benefit equal to the amount of the Medicare Part B premium (*i.e.*, 1971 CBA calls for Pension Plan to pay Medicare benefit of $5.60 per month for retirees and spouses). Pension benefits are subject to mandatory vesting under ERISA, and no right to modify or terminate the pension benefit is asserted by defendants in this case.

The last increase in this benefit was adopted by way of an Amendment to the Kirsch-UAW Retirement Income Plan. Adopting a "cap" on this benefit, the pension

plan provided that: "Effective July 1, 1980, and adjusted on each July 1 thereafter, the monthly amount payable [for this benefit], shall be the rate then in effect for Medicare Cost . . . *but not to exceed in any event the amount of $11.70.*" (Emphasis added.) At that time, the rate was $9.60. As a practical matter, however, once the Medicare Part B premium exceeded $11.70 (when that occurred exactly is not clear), retirees continued to be reimbursed in full for the premiums with the difference being contributed by the employer. The question is whether the parties' intended that the portion reimbursed by the employer would vest at the time of retirement.

Defendants main argument is that there was no contractual right to receive reimbursement for Medicare Part B premiums in excess of the pension benefit. The district court found that the right had its origin in the 1980 Addendum to the 1977 CBA, which made changes to benefits for *active* employees out of concerns related to the Age Discrimination in Employment Act (ADEA). Specifically, this Addendum eliminated mandatory retirement at age 65, and provided that:

> Active employees attaining age 65 will be required to subscribe to Medicare Part B *with Kirsch Company reimbursing said employees for the full cost of such Medicare coverage*. This will allow active employees, age 65 and over, to maintain the same level of benefits enjoyed prior to age 65.

(Emphasis added.) The district court reasoned that this right was then extended to retirees "by provisions that gave the retirees all the health benefits given to active employees as of June 1, 1980." *Bender*, 725 F. Supp. 2d at 648. However, as defendants point out, the CBA actually gave retirees "the same benefits as for the employees and their dependents as of *July* 1, 1980." (Emphasis added.) Because the Addendum expired before July 1, 1980, and this language was omitted from subsequent CBAs, plaintiffs concede that the reimbursement benefit was not directly extended to retirees. While this error admittedly undermines part of the district court's reasoning on this issue, it is not clear that it requires a different result.

Plaintiffs argue that it does not matter because the employees' right to full reimbursement continued under the "evergreen" clause in the absence of an express agreement to end it. That benefit, then, existed as of July 1, 1980, and was extended to retirees until it was modified by the 1998 Settlement Agreement discussed below. In fact, when the Addendum agreed to pay Medicare Part B premiums in full for active employees age 65 or older, the same Medicare Part B premiums for retirees were already being paid in full by the pension plan.

The parties' understanding is more clearly reflected in a written Settlement Agreement entitled "Medicare Part 'B' Coverage," which provided in full:

> As part of the 1998 Settlement between the parties and the implementation of the Newell Pension Plan effective August 1, 1998, it is understood and agreed as follows.
>
> 1. The payment of Medicare Part "B" coverage that was provided for under the Pension Plan in effect in 1991, but deleted from the plan during 1991, and then reimbursed to retirees, from assets of the company, shall be continued for retirees of record as of July 31, 1998.
>
> 2. Effective August 1, 1998, the Company shall continue to reimburse retirees for said Medicare Part "B" coverage provided they retire to pension on or after August 1, 1998, but on or before July 31, 2002, and provided further, the Company reimbursement for said coverage shall not exceed forty three dollars and eighty cents ($43.80) per month for each eligible retiree and/or retiree spouse.
>
> 3. Employees retiring to pension on or after August 1, 1998 shall not be eligible for spouse reimbursement for Medicare Part "B" coverage unless they have selected a spousal form of pension benefit.
>
> 4. Employees retiring to pension on or after August 1, 2002 will not be eligible for Medicare Part "B" coverage reimbursement from the Company.

Defendants argue that the agreement in paragraph 1 to continue to reimburse retirees of record as of July 31, 1998, for Medicare Part B coverage referred only to the pension benefit payment of $11.70 per month. Although not a model of clarity, it does say the Medicare Part B coverage "reimbursed to retirees, from assets of the company, shall be continued for retirees of record as of July 31, 1998." This not only seems to refer to the

reimbursements being made by the employer in excess of the pension benefit, but also would mean Newell was ending the reimbursement for *existing* retirees while merely phasing out the same reimbursement for *future* retirees. In fact, there is no dispute that the Settlement expressly created a "cap" on the employer reimbursement for those entering retirement on or after August 1, 1998, but before July 31, 2002; ended spousal reimbursement for those retiring on or after August 1, 1998; and ended the employer reimbursement completely for those retiring on or after August 1, 2002. The district court did not err in finding that this Settlement confirmed the arrangement in place since the 1980s—that the company would reimburse retirees for any cost of the Medicare Part B premium in excess of the pension plan benefit. *Bender*, 725 F. Supp. 2d at 648. It was not error to conclude that the CBAs were ambiguous with respect to whether the right to full reimbursement of Medicare Part B premiums was vested for "retirees of record as of July 31, 1998."

The district court outlined the extrinsic evidence supporting the conclusion that the parties intended the Medicare Part B premium reimbursement benefit to vest for retirees of record as of July 31, 1998, *id*., at 651-52, and then summarized that evidence as follows:

> The evidence also demonstrates the intent to vest full reimbursement for Medicare Part B insurance. The 1985 bargaining summary, for example, states that the company will reimburse the retirees and their spouses for the cost of the Medicare Part B premium. The retirement letters and application packages sent by the company between 1988 and 1993 state exactly the same thing. Mr. Oetman, an International Representative for the union at the Sturgis plant from 1984 through 1995, and Mr. Webster, the International Representative for the union after Mr. Oetman, also confirmed that the company and the Union intended to vest full reimbursement for Medicare Part B insurance. Mr. Webster was also part of the team that negotiated the 1998 Settlement Agreement for Medicare Part B reimbursement, and he stated that the 1998 Settlement Agreement was intended to vest full Medicare Part B reimbursement for those who retired prior to August 1, 1998.

*Id*. at 661. Mr. Oetman, stated that in the 1985 negotiations, "'the Company agreed to pay the Medicare Part B reimbursement so long as the retiree was receiving Medicare.

This meant for life.'" *Id*. at 651-52 (citation omitted). Mr. Webster explained that he was contacted several times after the plant closed by pre-August 1, 1998 retirees who were not getting completely reimbursed. He testified, however, that once he contacted Newell the reimbursements were increased to cover the full amount of the new Medicare Part B premium.

Defendants argue that the district court mischaracterized Mr. Webster's affidavit, which did not explicitly state that the Settlement Agreement intended to vest the right to full reimbursement. It may be inferred from what he did say, however:

> 3.     I assisted the Local Union in negotiation of the agreement entitled "Medicare Part 'B' Coverage" initiated on June 5, 1998, . . . . That agreement accomplished several things. First and foremost, it confirmed that the Employer's obligation to pay the Medicare Part B reimbursement to those who retired prior to August 1, 1998. For those two retired on or after that date, it confirmed the Employer's obligation to pay a flat amount–$43.80–towards the Medicare Part B reimbursement. This meant that those who retired on or after August 1, 1998 would not receive any additional reimbursement despite the fact that the Medicare Part B premiums would more than likely increase in the future.

Defendants also claim the district court erred by ignoring the deposition testimony of Webster's counterpart, Joe Marotti, who negotiated the 1998 Settlement Agreement for Newell, because Marotti testified that he understood the first paragraph to represent a maximum premium reimbursement of $11.70. In fact, Marotti explained that he assumed that it did because the Pension Plan provided a benefit "not to exceed $11.70," but acknowledged that he actually did not know. Marotti added that he intended that the Settlement Agreement would preserve the "status quo" with respect to past retirees and "freeze" the reimbursement at $43.80 for those future retirees who would retire between July 31, 1998, and June 31, 2002. Nor is it persuasive that McCurry, who had some human resources responsibilities at the Sturgis plant prior to its closing, questioned whether Newell was obligated to reimburse retirees for the increases in Medicare Part B premiums. McCurry made clear that she communicated this to someone at Newell,

but was advised that she was wrong and instructed to pay the full amount of Medicare Part B reimbursements for anyone who retired as of July 31, 1998.

Despite the misreading of the relevant date in the CBA, the evidence supports the district court's conclusion that the parties intended that full reimbursement of the Medicare Part B premiums in excess of the pension benefit would vest for those who retired on or before July 31, 1998.

## E.    Benefit Levels

*Corrected Judgment*.  Defendants challenge several aspects of the district court's corrected judgment.  First, defendants claim it was error to declare that vested healthcare benefits would be at levels in place as of December 31, 2005, rather than as of the respective dates of retirement.  However, the district court's declaration actually referred to the "levels in place for their respective retirement groups (pre-1986 retirees and 1986-1993 retirees) prior to the changes imposed by Defendants beginning January 1, 2006."

Second, as noted earlier, defendants argued that the judgment improperly included spouses of retirees who retired prior to the 1980 CBA, since coverage for spouses of employees (and therefore retirees) was not added until the 1980 CBA. Plaintiffs do not seem to disagree, responding that the judgment was consistent with this because it declares a right to medical insurance coverage based on the provisions in place for the respective retirement groups.  If defendants require clarification, it should be directed to the district court.

Third, defendants claim it was error to declare that benefits for 1986-1993 retirees shall include 100% of "out-patient expenses," thereby eliminating the 20% copay for *all* outpatient treatments, when the district court's opinion only eliminated copays for "outpatient and diagnostic services."  However, because the judgment

declares the benefit for "out-patient expenses as specified in the Court's Opinion," there is no obvious error and the district court should be able to clarify if necessary.[12]

*Coordination with Medicare (Pre-1986 Retirees).* Lastly, defendants contend that the district court erred in finding that the parties intended to provide pre-1986 retirees with coordinated (rather than integrated) health insurance benefits. Coordinated benefits would mean 100% coverage between Medicare and health insurance, while integration would result in payment of no more than what the health insurance would pay in the absence of Medicare. Defendants rely on the statement in the Aetna SPD that, "when Medicare benefits are available, the benefits of this plan will be reduced. Medicare and the plan together will now provide a level of benefits *at least as high* as that previously provided by the plan alone." (Emphasis added.) However, this neither precludes coordination nor specifies integration of Medicare benefits. Nor do defendants deny that the pre-1986 CBAs provided "the same coordination of benefits as the General Motors-UAW," or that the extrinsic evidence showed that the parties intended coordination of benefits prior to 1986 and changed to an integrated program beginning in 1986. *Bender*, 725 F. Supp. 2d at 663-64.

Finally, continued reliance on evidence that medical insurance was integrated with Medicare when coverage was transferred to Great West is misplaced. Although the application for insurance with Great West did not reflect coordination of benefits, the evidence established that (1) Great West was expected to duplicate the coverage provided by Aetna; and (2) Great West corrected the error at Newell's direction several months later to provide pre-1986 retirees, only, with coordination of benefits with Medicare. If anything, this evidence supports the plaintiffs' contention that the parties intended that there be a vested right to coordination of benefits for pre-1986 retirees.

---

[12]Nor is the district court's determination with respect to outpatient expenses undermined by the statement in the Cooper SPDs describing the plan as generally paying 80% of most medical expenses beyond the annual deductibles. *See Bender*, 725 F. Supp. 2d at 663.

**F.      Statute of Limitations**

The district court rejected defendants' argument that both medical insurance and Medicare Part B reimbursement claims were time barred. This court addressed the accrual of similar ERISA and LMRA claims for vested lifetime healthcare benefits in *Winnett v. Caterpillar, Inc. (Winnett II)*, 609 F.3d 404 (6th Cir. 2010). Because Congress did not provide a statute of limitations for these claims, courts must borrow from the forum state's most analogous cause of action. *Id.* at 408. Here, as the district court concluded, the plaintiffs' ERISA and LMRA claims are governed by Michigan's six-year statute of limitations for breach of contract. *Bender*, 725 F. Supp. 2d at 664 (citing *Santino v. Provident Life and Acc. Ins. Co.*, 276 F.3d 772, 776 (6th Cir. 2001) (ERISA); *Biros v. Spaulding-Evenflo Co.*, No. 88-712, 1989 WL 201625, at *3 (W.D. Mich. Aug. 1, 1989)). "Although state law sets the length of the statute of limitations, 'federal law' establishes when the 'statute of limitations begins to run.'" *Winnett II*, 609 F.3d at 408 (citation omitted). On the question of when the plaintiffs' claims accrued, we explained that:

> Under federal law, as under most laws, the limitations clock starts ticking "*when the claimant discovers or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged violation.*" *Noble v. Chrysler Motors Corp.*, 32 F.3d 997, 1000 (6th Cir. 1994) (LMRA); [*Muir*], 992 F.2d at 598 (ERISA). In the context of this contractual claim—the refusal to honor a promise of free, unalterable, lifetime healthcare benefits—the parties agree *the clock starts when the breach becomes "clear and unequivocal.*" *Morrison v. Marsh & McLennan Co.*, 439 F.3d 295, 302 (6th Cir. 2006).

609 F.3d at 408-09 (emphasis added). Although the same factors at play in *Winnett II* are at issue here, the district court did not err in rejecting the defendants' statute-of-limitations defense in this case.

First, with respect to plaintiffs' claims that defendants breached the vested right to medical insurance benefits by requiring retirees to pay a portion of the premium, it is defendants' contention that the claims accrued for all plaintiffs no later than June 1997 when Newell sent retirees a letter asserting a "right to modify the coverage and benefits

provided, as may be amended from time to time." In support, defendants rely on the fact that Bender was concerned that this letter was asserting a right that defendants did not have under the CBAs. Despite assurances that followed, defendants argue that this letter notified plaintiffs that Newell "no longer was willing to provide free, unalterable, lifetime healthcare benefits." *Id.* at 409. Indeed, defendants argue that these claims accrued even earlier with the reservation language in the 1978, 1989 and 1993 SPDs.

Unlike this case, however, *Winnett II* involved a "clear repudiation" of the promise of vested health insurance benefits where the SPDs spelled out that specific benefit changes would apply to existing retirees and would result in a cap on the employer's contributions; there were immediate benefit changes; it was expected that the VEBA trust funds would be exhausted; and the reservation-of-rights language was sufficiently unqualified so as to trigger an obligation by the union to object. *See id.* Here, the reservation-of-rights provisions were not unqualified, did not reflect "clear repudiation" of vested health insurance benefits for retirees, and did not result in any immediate changes in benefits. The district court did not err in finding that the health insurance claims accrued with the letter sent in November 2005 notifying retirees (including pre-1986 and 1986-1993 groups) of the intention to charge premiums effective January 1, 2006. Since the complaint was filed well within six years of the accrual, these claims were timely.

Second, defendants argue that the claims of plaintiffs Connor and Smoker for full reimbursement of Medicare Part B premiums accrued when those premiums exceeded the amount of their monthly reimbursement. Defendants maintain that starting sometime in 2000 or 2001, the Medicare Part B premiums first exceeded the reimbursements they were receiving of $50.00 and $43.80, respectively. As the district court found, however, defendants may have "inadvertently mishandled the claims of a handful of retirees, but the undisputed evidence shows that Defendants' promptly and fully corrected the mistakes." *Bender*, 725 F. Supp. 2d at 665. Also, as this court emphasized in *Winnett II*, such claims should accrue at the same time for each subclass of retirees. *Id.* at 664-65. Because the retiree claims for full reimbursement of Medicare Part B premiums did

not accrue until defendants announced their intention to discontinue making full reimbursement in 2006, these claims are timely even if the claims added in March 2009 do not relate back to the filing of the original complaint. The district court did not err in finding the Medicare Part B premium reimbursement claims of Connor and Smoker were timely.

## III.

For the reasons set forth above, the judgment of the district court is **AFFIRMED.**